❐ Original ❐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

CLERK'S OFFICE
A TRUE COPY
Apr 20, 2026
s/ vge
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
Records and information associated with the cellular device assigned call number numbers (773) 981-6881 ("Target Cell Phone 1") and (262) 330-2333 ("Target Cell Phone 2"), that is in the custody or control of T-Mobile, further described in Attachment A

Case No. 26-899M(NJ)
Matter No. 2024R438

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the ____________ District of ____________ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 5/4/2026 *(not to exceed 14 days)*

❐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Hon. Nancy Joseph .
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❐ for _____ days *(not to exceed 30)* ☑ until, the facts justifying, the later specific date of 04/29/2026 .

Date and time issued: 4/20/2026 @ 9:26 a.m.

Nancy Joseph
*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

**Return**

| Case No: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| 26-899M(NJ) | 04/20/2026 - Approx. 10:30 am | N/A |

Inventory made in the presence of:
N/A

Inventory of the property taken and/or name of any person(s) seized:

E/911/Cellular GPS Data

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the undersigned judge.

Date: ____________________

JEREMY S DORN Digitally signed by JEREMY S DORN Date: 2026.05.18 14:12:04 -05'00'

*Executing officer's signature*

Jeremy Dorn Special Agent

*Printed name and title*

Subscribed, sworn to, and returned before me this date:

Date: ____________________

*United States Magistrate Judge*

**ATTACHMENT A**
**Property to Be Searched**
**MATTER NUMBER 2024R438**

1. Records and information associated with the cellular device assigned call number **(773) 981-6881 ("Target Cell Phone 7")** and **(262) 330-2333 ("Target Cell Phone 8")**, whose service provider is T-Mobile ("Service Provider") a wireless telephone service provider headquartered at 4 Sylvan Way Parsippany NJ,07054 or any other cell phone servicing company currently servicing **Target Cell Phone 7 and/or "Target Cell Phone 8",** number during the requested period.

2. **Target Cell Phone 7**.

3. **Target Cell Phone 8.**

**ATTACHMENT B**
**Particular Things to be Seized**
**MATTER NUMBER 2024R438**

## I. Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with the **Target Cell Phones** for the time period from March 13, 2026, to present:

   i. Names (including subscriber names, user names, and screen names);
   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);
   iii. Local and long-distance telephone connection records;
   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;
   v. Length of service (including start date) and types of service utilized;
   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");
   vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);
   viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and
   ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **Target Cell Phones**, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and
(B) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received).

b. Information associated with each communication to and from the **Target Cell Phones** for a period of 30 days from the date of this warrant, including:
    i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;
    ii. Source and destination telephone numbers;
    iii. Date, time, and duration of communication; and
    iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **Target Cell Phones** or will connect at the beginning and end of each communication.

The Court has also issued an order(s) pursuant to 18 U.S.C. § 3123, dated today's date, for such information associated with the **Target Cell Phones**.

c. Information about the location of the **Target Cell Phones** for a period of **30 days**, during all times of day and night. "Information about the location of the **Target Cell Phones** includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

    i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the **Target Cell Phones** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.
    ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence and instrumentalities of distribution and possession with intent to distribute controlled substances; conspiracy to distribute and possess with the intent to distribute controlled substances; maintain drug involved premises; use of a communication facility in furtherance of a drug trafficking offense, violations of Title 21, United States Code, Sections 841, 843(b), and 846, have been committed by Jeanette LOPEZ, Samuel P. STAIR, Russell V. MCDADE, Otis LOCKETT, J.M.L., Ronald J. HEISEL, Ricky M. CRUZ, Alberto L. BOFFIL Jr., Walter J. RINGERSMA, Abraham M. LOPEZ, Brandon R. KING, Todji Y. ANDERSON Jr., Martin L. SINCLAIR, Jennifer O. PIERCE, Regina N. STAIR, Tracey L. UNDERWOOD, Shirtreal D. ROBY, "FROG" (Antone ROSS), William D. ESKRIDGE, Allyse D. JONES, Victoria T. ALLEN, Jermaine A. ERVING, and other unidentified subject(s) since at least August 2024.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Service Provider in order to locate the things particularly described in this warrant.

CLERK'S OFFICE
A TRUE COPY
Apr 20, 2026
s/ vge
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Records and information associated with the cellular device assigned call number numbers (773) 981-6881 ("Target Cell Phone 1") and (262) 330-2333 ("Target Cell Phone 2"), that is in the custody or control of T-Mobile, further described in Attachment A

Case No. 26-899M(NJ)

Matter No. 2024R438

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the ____________ District of ____________, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
| --- | --- |
| 21 U.S.C. Secs. 841, 843, 846 | Conspiracy to distribute and possess with the intent to distribute controlled substances; Distribution and possession with intent to distribute controlled substances; Use of a communication facility to facilitate a drug trafficking offense |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* 04/29/2026 *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Jeremy Dorn, SA HSI

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 4/20/2026

*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**
**MATTER NUMBER 2024R438**

I, Jeremy Dorn, a Special Agent with United States Department of Homeland Security Investigations (HSI), being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephones assigned call number **(773) 981-6881** ("**Target Cell Phone 7**") and **(262) 330-2333** ("**Target Cell Phone 8**"), collectively **Target Cell Phones**, whose service provider is T-Mobile ("Service Provider") a wireless telephone service provider headquartered at 4 Sylvan Way Parsippany NJ,07054 or any other cell phone servicing company currently servicing **Target Cell Phones** number during the requested period. The **Target Cell Phones** are described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. In this application, the United States seeks (1) historical cell-site location information; (2) historical precision location information; (3) prospective, real-time cell-site location information; (4) prospective, real-time precision location information (i.e., E-911 Phase II data and GPS); and (5) subscriber information and other historic non-content records and information.

3. Because this warrant application seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of an application by the United States of America for an order pursuant

to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices ("pen-trap devices") to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the **Target Cell Phones**.

4. I am a Special Agent of the United States Department of Homeland Security, Homeland Security Investigations/U.S. Immigration and Customs Enforcement (HSI/ICE), assigned to the Resident Agent in Charge (RAC) Milwaukee, Wisconsin. I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. I have been a federal law enforcement agent for over ten years.

5. I have received basic criminal investigative training, including thirty-six weeks at the Federal Law Enforcement Training Center (FLETC). In the course of my work, I have become knowledgeable with the enforcement of federal narcotics laws. I am currently a member of the Homeland Security Task Force as an investigator specializing in the smuggling, trafficking, and distribution of dangerous and controlled substances. I have participated in drug trafficking investigations conducted by HSI/ICE, the Drug Enforcement Administration (DEA), Federal Bureau of Investigation (FBI), the United States Postal Service (USPS) and other law enforcement agencies, which resulted in the arrest of subjects, and the seizure of property, assets, and controlled substances. As a narcotics investigator, I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover operations, court-ordered wiretaps, analysis of phone and financial records, and the arrests of numerous drug traffickers. I am familiar with various methods of smuggling and trafficking narcotics and other controlled substances and the

proceeds from sale of such substances. I am also familiar with methods used to evade detection of both the controlled substances and the proceeds from their sale that are used by drug traffickers. I have participated in investigations involving Title 21 offenses and am familiar with the Interagency Cooperation Agreement between the DEA and HSI. I have also been the affiant of search warrants.

6. I investigate criminal violations of the Federal laws, including, but not limited to Title 18, United States Code, Sections 1956 and 1957 and Title 21, United States Code, Sections 841, 843, 846, 848, 952, and 963. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage and importation of controlled substances. I have participated in the execution of multiple federal search warrants.

7. I have also received more general training and gained experience in interviewing techniques, search warrant applications, the execution of searches and seizures, and the seizure, processing, and identification of electronic devices.

8. I have received training in the area of narcotics investigations, money laundering, financial investigations, and various methods which drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of state and federal narcotics laws. I have participated or assisted in numerous federal and state search warrants for narcotic related offenses that have resulted in the seizure of United States Currency, vehicles, real estate, and jewelry from individuals involved in narcotic trafficking.

9. I have authored and/or aided in investigations that have led to the issuance of numerous search warrants involving violations of both state and federal narcotic laws. These

warrants involved the search of locations including: residences of targets, businesses their associates and relatives, "stash houses" (houses used as drug/money storage locations), storage facilities, bank safe deposit boxes, cellular/camera phones, and computers. Evidence searched for and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized therefrom, monetary instruments, and various assets that were purchased with the proceeds of drug trafficking.

10. Through training, experience, and discussions with other experienced agents:

a. I have learned about how individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States;

b. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine and crack cocaine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

c. I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded, and coded. I also know the various code names used to describe controlled substances;

d. I know drug dealers often put telephones in the names of others (nominees) or obtain pre-paid cellular telephones from companies where no subscriber name or address is required to distance themselves from telephones that they use to facilitate drug distribution. Because drug traffickers go through many telephone numbers, they often do not pay final bills when they are done using a telephone number and then are unable to put another line in the name of that subscriber;

e. I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

f. I know large-scale drug traffickers must maintain, on-hand, large amounts of U.S. currency to maintain and finance their ongoing drug business;

g. I know it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments, and/or the transfer of funds and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them;

h. I know it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences, their businesses, and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities or rival drug traffickers. These secure locations include, but are not limited to safes, briefcases, purses, locked filing cabinets, and hidden storage areas in natural voids of a residence;

i. I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transferring, concealing and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, and money wrappers. These items are maintained by the traffickers within residences (including attached and unattached garages), businesses or other locations over which they maintain dominion and control;

j. I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), computers, telex machines, facsimile machines, currency counting machines, and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

k. I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses that generate large quantities of currency;

l. I know drug traffickers commonly maintain addresses or telephone numbers in books or papers that reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization;

m. I know drug traffickers take or cause to be taken photographs of themselves, their associates, their property, and their drugs. These traffickers usually maintain these photographs in their possession; and

n. I know a "controlled buy" (and/or controlled contact) is a law enforcement operation in which an informant purchases drugs from a target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded buy money. When an informant is used, he/she is searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and monitoring device. When the transaction is completed, the informant meets case agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The informant is again searched for contraband, weapons, and money. Additionally, all telephone calls made by the informant while under the direction and control of case agents are recorded.

o. In addition, during the course of such residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

11. Further, I am aware through training and experience, as well as numerous conversations with both users of controlled substance and dealers of controlled substances, that drug traffickers may also establish stash houses. I am aware that stash houses are established as places where drug traffickers store large quantities of controlled substances, firearms, and cash. Drug traffickers may establish a trap house and a separate location as a stash house, where drug traffickers do not engage in sales to drug customers at the location, but use the location primarily for storage. Similar to trap houses, stash houses also serve the purpose of concealing this illegal conduct from the view of law enforcement and make it difficult to attribute possession of any drugs, firearms, or cash found within the stash house to a particular individual during a search conducted by law enforcement. For example, stash houses allow the trafficker to store a large amount of controlled substances at a location separate from their residence. Stash houses are often not in the drug trafficker's name, have minimal furniture, minimal signs of typical residential activity, lack items inside connecting the location to the drug trafficker, and are generally a quiet location with limited activity, which avoids drawing complaints or concerns from neighbors or law enforcement.

12. Further, I am aware through training and experience, as well as numerous conversations with both users of controlled substance and dealers of controlled substances, that often drug houses, also called trap houses, are established as places where a variety of drug-motivated crime can occur at a single location. This includes serving as a place where (1) drugs are stored, processed/packaged, sold, and/or used; (2) commercial sex acts are performed in exchange for drugs or money to purchase drugs; (3) stolen goods are sold/traded for drugs or money to purchase drugs; and (4) drug proceeds are stored before they are able to be laundered by the organization. Further, trap houses, also serve the purpose of concealing this illegal conduct from the view of law enforcement. For example, open-air drug markets where drugs are bought and sold on a street corner allow law enforcement to observe hand-to-hand transactions and more easily identify illegal conduct. By contrast, trap houses allow the trafficker to conduct drug sales behind closed doors and to control who is allowed access to the residence. These types of trap houses are commonly run by persons who are trusted to hold drugs and money and who are usually armed or given armed protection to perform this task. Oftentimes, these trap house operators as well as multiple drug users and others will be within the trap house so as to make it difficult to attribute possession of any drugs found within the trap house during a search conducted by law enforcement.

4. Further, based on training and experience, I am aware that it is a common practice within a drug trafficking organization (referred hereinafter as a ("DTO") to have various tasks assigned to persons involved in the organization. The members of the organization may have certain tasks, dependent on their hierarchy within the organization. It is common for those in charge of the organization to use those below them to make deliveries, transport, and hold/take possession of items, such as controlled substances for distribution or firearms for protection/intimidation. The

persons higher in the DTO often avoid conducting the hand-to-hand transaction in order to insulate themselves, to avoid apprehension/detection from law enforcement.

5. I have participated in investigations that have led to the issuance of search warrants involving drug trafficking, firearms offenses, and human trafficking. These warrants involved the search of locations including residences and businesses of targets, their associates and relatives; "stash houses" (i.e., houses used as drug/money storage locations); storage facilities; cellular/camera phones; and computers. Evidence searched for and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized from the distribution and sale of controlled substances, firearms, and/or human trafficking, and monetary instruments and various assets that were purchased with the proceeds of the drug trafficking, firearms, and/or human trafficking.

6. I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including to prove intent, motive, and to identify co-conspirators.

7. I have conducted investigations ranging from death, drug, property, and human trafficking crimes by analyzing cell phone data including tower usage, call activity, and cellular

activity while trying to pinpoint certain locations of suspects and/or victims. I know that when conducting drug and/or human trafficking investigations, cellular phone data is often a key piece of evidence based on my training and experience. Individuals who sell and use controlled substances and who engage in the trafficking of others often use cell phones to set up a transaction either through traditional means (phone calls or messaging) or by use of special applications downloaded on their phone. I know it is common practice for most people to rely heavily on the use of cellular telephones or electronic devices for many aspects of their daily lives. People commonly use cellular telephones or electronic devices to send and receive text messages, make voice calls, interact on social media, store contact information, store personal identifying data, maintain calendars or agendas, utilize maps or GPS functions, access the internet, and take photographs and videos. The same is true for those individuals who engage in drug trafficking and human trafficking.

8. I am familiar with the technologies of drug traffickers and those engaged in human trafficking. I know that drug traffickers and/or human traffickers often use electronic equipment and wireless and landline telephones to conduct drug trafficking and/or human trafficking operations. I know drug traffickers and/or human traffickers often use electronic devices, such as cellular devices, to generate, transfer, count, record, or store the information described above and to conduct drug trafficking and engage in human trafficking. I am familiar with computers, cellular devices, and other electronic media or electronic storage devices and their uses by drug traffickers to communicate with suppliers, customers, co-conspirators, and with fellow traffickers and/or human trafficking victims, customers, co-conspirators, and fellow human traffickers. I know that drug traffickers and/or human traffickers often keep documents and records about drug transportation, drug sourcing, drug ordering, drug sale, drug distribution, victim information, victim posting,

posting of advertising, communication with sex trafficking customers, human trafficking proceeds, etc. These documents, records, receipts, notes, and ledgers, regarding drug trafficking and/or human trafficking are often maintained where the traffickers have ready access. These records may be stored within computers, cellular devices, and other electronic media or electronic storage devices. These devices often contain evidence of illegal activities in the form of communication records, voicemail, email, text messages, video and audio clips, location information, business records, and transaction records. I know drug traffickers and/or human traffickers take, store, preserve, or maintain photographs or videos of themselves, their associates, their property, their drugs, their drug proceeds, their trafficking victims, and/or customers. These traffickers usually maintain these photographs or videos on computers, cellular devices, and other electronic media or electronic storage devices. I am familiar with and have experience in the use of devices used to commit those offenses as well as the available technology that can be used by law enforcement to assist in identifying the users of those devices and their locations.

9. I am currently participating in an investigation of the TARGET DTO and its members and associates. I am familiar with the facts and circumstances regarding this investigation as a result of my personal participation in this investigation, and my review of: (a) consensually recorded telephone conversations and face-to-face meetings; (b) recorded jail calls which, prior to the parties' discussion, provided a warning that the calls would be recorded; (c) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers; (d) information obtained from witnesses, including confidential sources and undercover agents; (e) administratively subpoenaed and court ordered records; and (f) court authorized wire and electronic intercepts.

10. Information contained in this affidavit was either obtained directly by me or by other investigators who I believe to be truthful and credible. The facts in this affidavit come from personal observations, training and experience, and information obtained from other investigators and witnesses.

11. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that possible crimes of:

a. possession with intent to distribute and the distribution of controlled substances in violation of Title 21, United States Code, Section 841(a)(1);
b. conspiracy to commit those offenses in violation of Title 21, United States Code, Section 846;
c. use of communication facilities to further and to facilitate the above listed offenses, in violation of Title 21, United States Code, Section 843(b); and
(hereinafter referred to collectively as the "TARGET OFFENSES")

have been committed by Jeanette LOPEZ, Samuel P. STAIR, Russell V. MCDADE, Otis LOCKETT, J.M.L., Ronald J. HEISEL, Ricky M. CRUZ, Alberto L. BOFFIL Jr., Walter J. RINGERSMA, Abraham M. LOPEZ, Brandon R. KING, Todji Y. ANDERSON Jr., Martin L. SINCLAIR, Jennifer O. PIERCE, Regina N. STAIR, Tracey L. UNDERWOOD, Shirtreal D. ROBY, "FROG" (Antone ROSS), William D. ESKRIDGE, Allyse D. JONES, Victoria T. ALLEN, Jermaine A. ERVING, and other persons as yet unknown (hereinafter "TARGET SUBJECTS"). There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

**JURISDICTION**

12. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

**TIII Authorization**

13. On December 19, 2025, the Honorable J.P. Stadtmueller, United States District Judge, Eastern District of Wisconsin, entered an order authorizing the initial interception of wire and electronic communications to and from (414) 439-8361, used by LOPEZ and initial interception of wire communications to and from (414) 639-1158, used by LOPEZ. On January 16, 2026, interceptions of (414) 439-8361 and (414) 639-1158 were extended and are set to end on February 14, 2026. Also on January 16, 2026, the Honorable J.P. Stadtmueller, United States District Judge, Eastern District of Wisconsin, entered an order authorizing the initial interception of wire and electronic communications to and from (414) 732-3682, used by STAIR, which is set to expire on February 14, 2026. On February 13, 2026 and March 13, 2026, the Honorable J.P. Stadtmueller, United States District Judge, Eastern District of Wisconsin, entered an order authorizing the extension of wire and electronic communication interception to and from (414) 732-3682, used by STAIR, which expired on April 11, 2026.

**PROBABLE CAUSE**

**A. Background**

14. Since May 2024, HSI has been investigating allegations that members of the DTO are conspiring with each other, and other individuals yet unknown, to operate stash houses and trap

houses for the purpose of storing and distributing controlled substances in Milwaukee, Wisconsin, and using numerous properties owned by STAIR to engage in their conduct.

15. Based on my training and experience, I know that a "controlled buy" is a law enforcement operation in which an informant, such as CS#1, purchases drugs from a target at the direction of law enforcement. For the below outlined controlled buys, the operations were generally conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When a CS was used, she/he was searched for contraband, weapons, and money before the operation. The CS was also wired with a concealed body recorder and/or a monitoring device. When the transaction was completed, the CS met cases agents at a pre-determined meet location and gave the purchased drugs and the recording/monitoring equipment to the case agents. The CS was again searched for contraband, weapons, and money and then interviewed by the case agents about the drug transaction. The information provided by a CS was confirmed on the recording/monitoring equipment. A sample of the suspected drugs was then field tested by the case agents for the presumptive presence of controlled substances and then placed in inventory pursuant to normal inventory procedures. Further, often the calls to the target by the CS, which were consensually recorded calls, were done under the direction and control of case agents and/or made in the presence of case agents.

16. Special Agents of HSI, case agents and local officers have received information concerning the illegal drug trafficking activities of members of the TARGET DTO from confidential human sources (CS #1 and CS #2):

a. CS #1 has given information concerning individuals involved in illegal activities, which has been independently verified through this investigation. The information has been

verified through controlled buys, video recordings obtained during the controlled buys, queries through law enforcement databases, and surveillance. CS #1 began cooperating with law enforcement for consideration on pending criminal drug charges in Forest County beginning in approximately March 2025. CS #1 has had past arrests or convictions for felony drug offenses, felony family support offenses, felony and misdemeanor bodily harm offenses, resisting/obstruction, traffic offenses and noncriminal retail theft offenses. Further, during CS #1's cooperation, on May 30, 2025, CS #1 was re-arrested on drug offenses by State Patrol in Outagamie County, and his cooperation ended. This drug conduct was not at the direction of law enforcement and was contrary to CS #1's cooperation agreement. Within the context of the information detailed and relied upon for purposes of this application, I believe that CS #1 is credible and that CS #1's information is reliable notwithstanding CS #1's violation of CS #1's cooperation agreement.

b. CS #2 reported to the case agents with the FBI from approximately March of 2025 to the end of May 2025. In May 2025, CS #2 began cooperating with HSI. CS #2 was initially cooperating with FBI and other law enforcement officers in hopes of receiving third-party consideration for a family member on a felony criminal matter, until May 2025. No consideration has been provided to that family member. CS #2 is now cooperating in exchange for monetary consideration. To date, CS #2 has received one monetary payment of $10,000 for CS #2's cooperation with HSI. Certain information provided by CS #2 concerning this investigation has been corroborated from external sources, including consensually recorded audio and visual recordings, and a review of information contained within law enforcement databases. CS #2 is a convicted felon and has a criminal history that includes prior misdemeanor convictions for traffic offenses, Bail Jumping, Disorderly

Conduct, Possession of THC, Resisting an Officer, and Retail Theft. CS #2 has prior felony convictions for Robbery and Manufacture / Deliver Cocaine. I have discussed CS #2's cooperation with the law enforcement officer with whom CS #2 was working in exchange for third-party consideration. The officer indicated that CS #2 has provided reliable cooperation to that agency and believes that CS #2 is reliable. At no time during CS #2's cooperation with the HSI have I found CS #2 to have provided false information or engaged in untruthful or deceptive behavior. As further detailed below, during controlled operations, the basis of CS #2's information has been confirmed by case agents and determined to be truthful and reliable. Further, CS #2's information is based on CS #2's own personal observations and participation in surveilled controlled operations. Within the context of the information detailed and relied upon for purposes of this application, I believe that CS #2 is credible and that CS #2's information is reliable. CS #2 is currently cooperating with law enforcement.

17. At various times between April 2025, and February 2026, United States Magistrate Judges for the Eastern District of Wisconsin have authorized the use of pen registers and trap and trace devices for DTO telephone lines. At various times between April 2025, and January 2026, United States Magistrate Judges for the Eastern District of Wisconsin have signed orders for prospective precision location data (pings) for DTO telephone lines.

18. As part of the investigation, case agents have reviewed numerous recorded jail calls between in custody inmates and MCDADE and recorded jail calls between in custody inmates SINCLAIR, LOPEZ and STAIR. Case agents have identified MCDADE, SINCLAIR, STAIR, and LOPEZ by their voices, names, and other facts shared in the recordings that are consistent with MCDADE, SINCLAIR, STAIR, and LOPEZ. Case agents also identified STAIR's telephone

number as (414) 732-3682; LOPEZ's telephone numbers as (414) 439-8361 and (414) 639-1158; and BOFFIL's telephone number as (262) 234-8917, further outlined below.

19. Based on training and experience, I know that a "controlled buy" is a law enforcement operation in which an informant, such as CS#1, purchases drugs from a target at the direction of law enforcement. For the below outlined controlled buys, the operations were generally conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When a CS was used, she/he was searched for contraband, weapons, and money before the operation. The CS was also wired with a concealed body recorder and/or a monitoring device. When the transaction was completed, the CS met cases agents at a pre-determined meet location and gave the purchased drugs and the recording/monitoring equipment to the case agents. The CS was again searched for contraband, weapons, and money and then interviewed by the case agents about the drug transaction. The information provided by a CS was confirmed on the recording/monitoring equipment. A sample of the suspected drugs was then field tested by the case agents for the presumptive presence of controlled substances and then placed in inventory pursuant to normal inventory procedures. Further, often the calls to the target by the CS, which were consensually recorded calls, were done under the direction and control of case agents and/or made in the presence of case agents.

**B. MCADED Investigation and Arrest**

20. STAIR is the owner and operator of S2 Real Estate as well as at least 43 Limited Liability Companies in similar names. STAIR, though his LLCs, owns over 100 rental properties throughout the greater Milwaukee area.

21. STAIR, through S2 Real Estate, employs LOPEZ and others.

22. Since approximately May 2024, case agents have been investigating the DTO, which has been connected to several overdose deaths and appears to be connected to MCDADE.

23. The DTO has been identified as operating out of multiple residences owned by STAIR through his limited liability companies. As part of the investigation into the DTO, case agents have identified that STAIR and LOPEZ knowingly rents properties to drug traffickers for the purpose store and/or selling controlled substance.

24. As part of the investigation, case agents have identified several properties owned by STAIR, which have operated as trap houses or been otherwise involved in the distribution and storage of controlled substances including 712 South 21st Street Milwaukee, Wisconsin, 1512 South 21st Street, Milwaukee, Wisconsin (the "21st Street House") and 1425 West Greenfield Avenue, Milwaukee, Wisconsin (the "14th Street House"). Case agents have connected MCDADE to several of these trap houses.

25. As detailed below, as part of the investigation into MCDADE, case agents obtained several warrants authorizing agents to collect data pertaining to the locations of telephones used by MCDADE (414) 514-3794 and (414) 439-7468. Case agents subsequently reviewed data between June 6, 2025, and June 14, 2025. Data pertaining to the locations of (414) 514-3794 and (414) 439-7468 revealed that MCDADE's telephones traveled from Milwaukee, Wisconsin to the Chicago area five times in the span of nine days. Case agents observed telephones (414) 514-3794 and (414) 439-7468 remained in the Chicago area for a short period of time before returning to Wisconsin.

26. On June 6, 2025, June 9, 2025, and June 11, 2025, the cell phone locations show that these two phones traveled from Milwaukee, WI, to the southside of Chicago, IL, specifically to the area of W. 63rd Street and S. Halstead Street in Chicago.

27. Case agents reviewed court-authorized cellular telephone records and location data for each of the dates MCDADE traveled to W. 63rd Street and S. Halstead Street in Chicago and MCDADE. Case agents observed that one of the phone numbers MCDADE was in contact with on June 11, 2025, was **(773) 981-6881** (**Target Cell Phone 7**). Case agents know 773 is an area code that serves the Chicagoland area. A search of law enforcement databases (Accurint and TLO) revealed **Target Cell Phone 7** listed to Jermaine A. ERVING (DOB: XX/XX/1976) of 6318 S. Aberdeen Street, Chicago, IL. In addition, a query of CashApp revealed **Target Cell Phone 7** was affiliated with username of "Jermaine." Case agents are aware 6318 S. Aberdeen Street is in the immediate area near where MCDADE's two cellular telephones ((414) 514-3794 and (414) 439-7468) were located each time MCDADE traveled to Chicago.

28. Case agents are also aware MCDADE's cellular telephones (414) 514-3794 and (414) 439-7468) traveled along the Illinois Tollway. Case agents compared the locations of the cell phones (414) 514-3794 and (414) 439-7468) information to an Illinois Tollway map and identified a cell location record showing the phones (414) 514-3794 and (414) 439-7468) passing Toll Plaza 21 on June 6, 2025, June 9, 2025, and June 11, 2025. Case agents contacted an employee with the IL Tollway who ran a license plate query from the toll cameras for the vehicles associated with MCDADE during that time. On June 9, 2025, when the cell phone location shows that MCDADE's phones were passing through Toll Plaza 21, the toll cameras captured Wisconsin license plate AZY-8870 crossing the toll station. Case agents reviewed Wisconsin Department of Transportation (WIDOT) records and observed the license plate was registered to Max Berzowski DOB: XX/XX/1971 with no vehicle associated with the plate. As detailed below, case agents are aware through previous surveillance that the vehicle bearing Wisconsin license plate AZY-8870 was linked

to MCDADE and MCDADE had been observed as a passenger in this vehicle bearing Wisconsin license plate AZY-8870 on previous occasions. Like on May 27, 2025, case agents observed MCDADE exit 1425 W. Greenfield Avenue and enter the driver's seat of AZY-8870. Case agents are aware MCDADE uses vehicles registered in other persons names to avoid detection from law enforcement while procuring and/or distributing narcotics.

29. On June 6, 2025, at approximately 12:14 a.m., MCDADE's telephones (414) 514-3794 and (414) 439-7468) appeared to depart near Lake Forest, IL. At approximately 12:59 a.m. MCDADE's telephones (414) 514-3794 and (414) 439-7468) were both in the area of the Englewood Neighborhood near W. 63rd Street and S. Carpenter Street, Chicago, IL. At approximately 1:29 a.m., the telephones (414) 514-3794 and (414) 439-7468 appeared to head towards Milwaukee, WI from the Englewood Neighborhood and arrived in the area of Milwaukee around 3:00 a.m. Based on the investigation into MCDADE, case agents believe the trip began in Milwaukee, WI, similar to subsequent trips listed below; however, data from court authorized electronic surveillance did not have information as to the locations of telephone numbers (414) 514-3794 and (414) 439-7468 prior the departure at 12:14 a.m. from Lake Forest, Illinois.

30. On June 9, 2025, on his route back from Chicago to Milwaukee, MCDADE's cellular telephones (414) 514-3794 and (414) 439-7468 and vehicle with Wisconsin license plate AZY-8870 passed through the tollway at Plaza 21 at the same time. Additionally, law enforcement databases show the vehicle with Wisconsin license plate AZY-8870 located in the area of I-90 Expressway and W. 59th Street on June 8, 2025, at 11:36 p.m. which corresponds with the location of MCDADE's cellular telephones (414) 514-3794 and (414) 439-7468 at that time.

31. Case agents reviewed court authorized electronic surveillance for telephone numbers

for MCDADE's cellular telephone numbers (414) 514-3794 and (414) 439-7468 on June 8, 2025, at approximately 9:00 p.m. departed the Milwaukee, Wisconsin area. At approximately 11:10 p.m., MCDADE's telephones arrived at the area of Englewood Neighborhood near W. 63rd Street and S. Carpenter Street, Chicago, IL. At approximately 11:40 p.m., both telephones left the area of the Englewood Neighborhood near W. 63rd Street and S. Carpenter Street, Chicago, IL. Then on June 9, 2025, at approximately 2:00 a.m., MCDADE's telephones returned to the Milwaukee, Wisconsin.

32. Case agents reviewed recorded jail calls for inmate pin # for Amber L. Valadez to MCDADE's number of (414) 514-3794 placed on June 9, 2025, at approximately, 8:01 a.m. (38811067_553878_06-09-2025_08-01-25_1-(414) 514-3794_4901). Detective Sharif Said reviewed this call and recognized the voice of the male who answered the phone as MCDADE. During this call, at approximately 1 minute and 26 seconds into the recording, MCDADE stated that he was in Chicago, IL and he was busy. Case agents this was a reference to MCDADE traveling to Chicago, IL the night of Jun 8, 2025, and returning during the early morning hours of June 9, 2025.

33. On June 11, 2025, at approximately 2:00 a.m., MCDADE's telephones (414) 514-3794 and (414) 439-7468 departed the Milwaukee, WI area. At approximately 3:35 a.m., the telephones appeared to have arrived at the area of Englewood Neighborhood near W. 63rd Street and S. Carpenter Street, Chicago, IL. At approximately 4:05 a.m., both telephones (414) 514-3794 and (414) 439-7468 left the area of the Englewood Neighborhood near W. 63rd Street and S. Carpenter Street, Chicago, IL. On June 11, 2025, at approximately 6:00 a.m., MCDADE's telephones (414) 514-3794 and (414) 439-7468 returned to Milwaukee, Wisconsin.

34. Also on June 11, 2025, at approximately 6:10 a.m., case agents conducted surveillance and captured on video a Chevy Trax with Wisconsin license plate AVU-4071. Case

agents reviewed WI DOT records and observed the vehicle was registered to Megan Morgan, DOB: 02/01/1986 on a silver 2020 Chevy Trax. The vehicle was parked directly in front of 1425 W. Greenfield Avenue, Milwaukee, WI, the same location MCDADE conducted controlled drug buy with CHS #1 on May 20, 2025. Case agents observed a black male and a white female exit the front of 1425 W. Greenfield Avenue and enter the Chevrolet Trax. Case agents then reviewed plate readers in the Chicago Illinois area and determined that the Trax was captured by photograph on June 11, 2025, at 3:56 a.m. by plate readers on the Dan Ryan Expressway at 59th Street in Chicago, IL. This was also consistent with location data which revealed at that time that MCDADE's telephone (414) 514-3794 and (414) 439-7468 were in the area of the Dan Ryan Expressway at 63rd Street at 3:50 a.m. and 3:51 a.m., respectively.

35. Also on June 11, 2025, while conducting surveillance at 1425 W. Greenfield Avenue, Milwaukee, WI, case agents observed individuals entering and leaving the address, and entering the aforementioned black Minivan, bearing Wisconsin license plate AZY-8870, as previously noted registered to Berzowski.

36. On June 13, 2025, at approximately 12:42 p.m., MCDADE's telephones departed the Milwaukee, WI area. At approximately 3:22 p.m., the telephones arrived at the area of Englewood Neighborhood near W. 63rd Street and S. Carpenter Street, Chicago, IL. At approximately 5:29 p.m., both telephones left the area of the Englewood Neighborhood near W. 63rd Street and S. Carpenter Street, Chicago, IL. On June 13, 2025, at approximately 9:41 p.m., both MCDADE's telephones (414) 514-3794 and (414) 439-7468 returned to Milwaukee, WI.

37. On June 14, 2025, at approximately 8:13 p.m., MCDADE's telephones (414) 514-3794 and (414) 439-7468 departed Milwaukee, WI. At approximately 9:29 p.m., the telephones

arrived in area of Englewood Neighborhood near W. 63rd Street and S. Carpenter Street, Chicago, IL. At approximately 10:14 p.m., MCDADE's telephones (414) 514-3794 and (414) 439-7468 left the area of Englewood Neighborhood near W. 63rd Street and S. Carpenter Street, Chicago IL and returned to the Milwaukee, WI area at approximately 12:18 a.m. on June 15, 2025.

38. Based on training and experience, case agents know that frequent short trips, as the ones described above, are consistent with drug trafficking, more specifically, consistent with those engaged in picking up larger amounts of controlled substances to distribute. Based on the aforementioned information, case agents believe MCDADE, and others, were travelling to Chicago, IL to procure large quantities of narcotics to transport back to WI in order to distribute them. Case agents are also aware MCDADE uses multiple phones to either procure and/or distribute narcotics. Case agents have reviewed court authorized cellular phone location data from (414) 514-3794 and (414) 439-7468 and observed both phones consistently at the same locations in proximity while traveling.

39. On October 14, 2025, MPD executed a state search warrant at the 14th Street house, which was identified as a trap house used by MCDADE. MPD observed MCDADE, associate of STAIR and LOPEZ, arrive at the 14th Street House as a passenger in a Chevy Trailblazer, bearing Wisconsin license plate BBF-3776 (Trailblazer) shortly before the execution of the warrant.

40. When MPD executed the warrant, MCDADE and others inside the trap house at the 14th Street House attempted to flee out of a window. MPD arrested MCDADE around 11:41 p.m. Located on MCDADE was $2,097; a smart flip phone blue Motorola razor with a brown case with stripes; and a black Apple iPhone in a black case.

41. Inside the 14th Street house, MPD located over 140 grams of a substance that field tested positive for cocaine and 90 grams of a substance that field tested positive for fentanyl from a trash can near where MCDADE and others attempted to jump out the window. MPD also located: a Phoenix Arms Raven .25 caliber handgun, numerous ammunition; a gray Samsung touch screen cellphone with a black case; a gray Samsung touch screen cellphone with a black and pink case; digital scales; drug paraphernalia; suspected drug ledger, and items consistent with cooking crack cocaine. Also located inside the 14th Street House was a camera surveillance system, including DVR systems. The surveillance system located by MPD was consistent with the surveillance system CS#2 described to case agents. MPD also located a document with MCDADE's name on it in a bedroom. Law enforcement also found thousands of hypodermic needles and over a dozen nasal doses of Naloxone, which is used to counter the effects of an overdose. Based on training and experience, I believe that the items located at the 14th Street House are consistent with the residence being used as a trap house.

42. MCDADE was charged in Milwaukee County Case 2025CF4892 for drug related offenses and has remained in custody since his arrest.

43. While MCDADE has been incarcerated at the Milwaukee County House of Corrections, case agents have reviewed recorded jail calls with individuals identified as Victoria ALLEN, Allyse D. JONES, and others. These calls revealed that members of the DTO are continuing to procure and distribute narcotics on MCDADE's behalf while he is in custody. Based on the phone calls below, case agents believe JONES, ALLEN, and others are procuring narcotics from the same supplier located in Chicago, IL MCDADE procured narcotics from prior to his arrest. Case agents previously identified the suspected source of supply for MCDADE as Jermaine

ERVING using the cellular telephone number **Target Cell Phone 7**. Case agents used electronic and physical surveillance of MCDADE's cellular telephones showing MCDADE travelled to Chicago, IL numerous times late at night and in the early morning hours and returned directly to Milwaukee after meeting at, or near, ERVING's residence at 6318 S. Aberdeen Dr, Chicago, IL.

44. Based on recorded jail calls, physical surveillance, and license plate reader technology, case agents believe JONES and ALLEN are supporting MCDADE in the procurement and distribution of narcotics from ERVING for the MCDADE DTO.

45. On December 31, 2025, at approximately 5:19 p.m., case agents conducted surveillance at 6408 N. 73rd street and observed Allyse JONES park a gray, 2014 Nissan Pathfinder bearing Wisconsin license plate VK5729 (Nissan). Case agents were aware that JONES was in contact with MCDADE (in custody) and EVERING, as described in more detail below. Case agents reviewed WIDOT records which indicated the Nissan was registered to Virgil E. Erby DOB: XX/XX/1966 of 3430 W. Wisconsin Ave #416 Milwaukee WI. Case agents observed JONES exit the Nissan and then enter her residence at 6408 N. 73rd Street. Case agents are aware when MCDADE was not in custody, MCDADE would use vehicles registered to ERBY to distribute narcotics throughout Southeastern Wisconsin. Case agents are also aware MCDADE would distribute the narcotics north of Milwaukee in Fond du Lac County, Wisconsin.

46. Case agents believe JONES is the user of (612) 525-0135 because: (1) In review of recorded jail calls with MCDADE and telephone number (612) 525-0135, MCDADE identifies the user of (612) 525-0135 as "A", (2) A query of TLO, a law enforcement database revealed that (612) 525-0135 is affiliated with JONES; and (3) During contact with the Racine (WI) Police Department on June 1, 2025 (Activity #25-024644), JONES provided her number as (612) 525-0135. Case agents

have reviewed jail communications between MCDADE and (612) 525-0135 as recently as February 9, 2026 and believe that JONES is still the primary user of this phone.

47. Case agents conducted telephone toll analysis for JONES' number (612) 525-0135. This analysis revealed that on December 24, 2025, at approximately 10:14 a.m., JONES called ERVING's **Target Cell Phone 7**. This call duration was 2 seconds. At 10:18 a.m., ERVING's **Target Cell Phone 7**, called JONES at (612) 525-0135. This call had a duration of 4 minutes 39 seconds.

48. Case agents reviewed license plate reader activity regarding the Nissan license plate VK5729 (WI) known to be driven by JONES and observed that on December 29, 2025, the Nissan license plate VK5729 was captured while driving through Fond du Lac County at #12 Hwy 67 @Ashland Dr EB. The Nissan license plate VK5729 was captured at 12:19 p.m. and again at 12:30 p.m. Based on training, experience, and the investigation into the DTO, case agents believe JONES utilized VK5729 (WI) to deliver narcotics to Fond du Lac County at the request and direction of MCDADE.

49. Case agents believe after MCDADE went to jail, he was using JONES and other co-conspirators, both known and unknown, to procure narcotics from ERVING in Chicago and distribute narcotics in Wisconsin in order to continue MCDADE's DTO.

**C. MCDADE's Jail Calls and Ongoing Drug Trafficking**

50. Case agents have reviewed jails calls from MCDADE's PIN since MCDADE has been in custody at the Milwaukee County Jail. Case agents reviewed a jail call made on October 20, 2025, from MCDADE's PIN to telephone number (262) 234-8917. As detailed above, I am familiar with MCDADE's voice and can identify MCDADE as the inmate placing this call. During the call,

MCDADE referred to the user of (262) 234-8917 as "Nephew." Based on this investigation, case agents identified "Nephew" as BOFFIL. During this call, MCDADE directed BOFFIL to contact STAIR.

51. Case agents identified and listened to a subsequent call between BOFFIL and MCDADE on October 20, 2025. In that call, MCDADE asked whether BOFFIL "talked to him?" Based on the investigation into the DTO and the fact that BOFFIL contacted STAIR later in this call, I believe that MCDADE was referring to STAIR when MCDADE asked about "…him…". BOFFIL confirmed that he had spoken with him. BOFFIL explained that STAIR discussed how there was damage to the house when "the crackhead went out the window." Based on the investigation into the DTO, this statement is consistent with when several people, including MCDADE, attempted to flee out the window of the 14th Street House during the execution of a search warrant. Further, based on my training and experience, the term "crackhead" is often used to describe a person who uses crack cocaine.

52. During the October 20, 2025, call between BOFFIL and MCDADE, MCDADE directed BOFFIL to call STAIR on another phone. BOFFIL did so, and case agents could hear STAIR on the recorded jail call. As detailed above, I am familiar with STAIR's voice and am able to recognize STAIR as the person with whom MCDADE spoke on this call. Further, during the call, MCDADE referred to him as "Sam." Based on this, I believe BOFFIL contacted STAIR using BOFFIL's phone to avoid law enforcement detection, as directed by MCDADE. STAIR stated to MCDADE, "Man, I gave you a heads up that...ah, there's so much drama going on" and MCDADE spoke over STAIR and cut STAIR off stating, "Sam, Sam, quit talking over the phone." Based on my training, experience, and investigation into the DTO, I believe STAIR statements relate to STAIR attempting to warn MCDADE when trap houses are being watched by law enforcement,

specifically 1425 West Greenfield Avenue ("Man, I gave you a heads up that...ah, there's so much drama going on"). Further, I believe that given MCDADE's knowledge of law enforcement investigation techniques, he is attempting to stop STAIR from making incriminating admissions on the record jail call ("Sam, Sam, quit talking over the phone."). MCDADE and STAIR continued discussing matters.

53. After concluding the conversation with STAIR, MCDADE directed BOFFIL to call "Jeanette." Case agents then heard a female voice on the phone determined to be LOPEZ based on case agents' familiarity with LOPEZ's voice as documented above and from court authorized wire intercepts.

54. During the call, MCDADE directed LOPEZ to "go somewhere where I can rap with you real quick." LOPEZ responded, "I'm by myself." During the conversation, MCDADE asked LOPEZ to talk with "dude" and indicated that MCDADE just spoke with him on the phone and says "Sam". I believe this involved MCDADE speaking with STAIR and then discussing that conversation with LOPEZ. During the call, MCDADE, LOPEZ, and BOFFIL discussed STAIR helping MCDADE with his bail. LOPEZ stated, "he should have been 10 steps ahead." Based on training, experience, and the investigation into the DTO, I believe that LOPEZ's statement referred to STAIR warning MCDADE regarding the police coming to search the 14th Street House. They also discussed getting money back from the deposit and selling a car.

55. Case agents reviewed call detail records for October 20, 2025, at approximately 12:08 p.m., when BOFFIL contacted STAIR for MCDADE. Case agents observed BOFFIL's telephone number (262) 234-8917 contacted STAIR's telephone (414) 732-3682 on October 20, 2025, at approximately 12:09 p.m. Further, after the call between MCDADE, BOFFIL and STAIR, case

agents observed that BOFFIL's telephone number (262) 234-8917 contacted LOPEZ at (414) 439-8361 to discuss the drug trafficking operation, as recorded on the jail call.

56. Based on my training and experience, I believe this recorded jail call is consistent with STAIR, LOPEZ, BOFFIL, and MCDADE conspiring to engage in drug trafficking and STAIR attempting to warn MCDADE when trap houses are being watched or targeted by law enforcement.

57. On November 12, 2025, at approximately 7:20 p.m., MCDADE called Shirtreal ROBY at (414) 252-8847 from the Milwaukee House of Correction (Jail call # 740505968_2025018513_11-12-2025_19-20-51_1-414-242-8847).

58. Case agents believe ROBY is the user of (414) 242-8847 because: (1) In review of recorded jail calls with MCDADE and telephone number (414) 242-8847, MCDADE identifies the user of (414) 242-8847 as "Shirtreal"; and (2) A query of TLO, a law enforcement database revealed that (414) 242-8847 is affiliated with ROBY. Case Agent has reviewed jail communications between Russell MCDADE and (414) 242-8847 as recently as February, 2, 2026 and believes that ROBY is still the primary user of this phone.

59. Durning the record jail call, ROBY advised that she was going to text "them," but he said, "don't text my number to nobody and you don't give no number, my number, to nobody because you give it to him directly." MCDADE appeared to change the conversation and asked ROBY how her son was doing. ROBY explained how her son was suspended from school and kicked off the school bus. MCDADE asked for the number that he was trying to get, and ROBY told MCDADE the phone number was **Target Cell Phone 7**. As mentioned previously, this number was affiliated with ERVING. MCDADE later told ROBY that he was going text Maria on the "tablet" the next day and ROBY said that Maria had called her and talked about some "green cards." Case agents

believe **Target Cell Phone 7** is used by MCDADE's narcotics supplier from Chicago, Illinois.

60. On November 21, 2025, at 8:21 a.m., MCDADE used a House of Corrections tablet to send a message to JONES at (612) 525-0135. MCDADE's PIN texted JONES, "Good morning bae waiting on the phones to come on I love u bae this cuz number, (773) 981-6881 [(**Target Cell Phone 7**)] face time when I call". From previously recorded phone calls, case agents know JONES would not talk to ROBY directly and was looking for MCDADE's supplier's phone number, **Target Cell Phone 7.**

61. On January 9, 2026, at approximately 8:13 p.m., MCDADE called Victoria ALLEN at **(262) 330-2333** (**Target Cell Phone 8**) from the Milwaukee House of Corrections (Jail call # 743521914 _2025018513_01-09-2026_20-13-47_1-262-330-2333).

62. Case agents believe ALLEN is the user of **(262) 330-2333** (**Target Cell Phone 8**) because: (1) In review of recorded jail calls with MCDADE and telephone number **(262) 330-2333** (**Target Cell Phone 8**), MCDADE identifies the user of **(262) 330-2333** (**Target Cell Phone 8**) as "Victoria"; (2) A query of TLO, a law enforcement database revealed that **(262) 330-2333** (**Target Cell Phone 8**) is affiliated with ALLEN; and (3) a query of CashApp revealed **(262) 330-2333** (**Target Cell Phone 8**) is affiliated to "Victoria Allen." Case agents have reviewed jail communications between MCDADE and **(262) 330-2333** (**Target Cell Phone 8**) as recently as February 9, 2026 and believes that ALLEN is still the primary user of this phone.

63. ALLEN stated, "I'm on my way to Chicago, he just told us to come on now." MCDADE told ALLEN to be safe. MCDADE then told ALLEN that he spoke to "Nephew" and told "Nephew" that he owed "Vicky" an apology. MCDADE then said that "J-Rock" was over at that lady "J-Lo" house and the "feds" ran in his house earlier and "Y'all gotta keep that nigga away

from y'all." MCDADE later said that he "J-Rock" was running because he owed "Nephew" some money. MCDADE asked ALLEN if anybody had an extra phone by her and ALLEN could be heard in the background trying to get an additional phone. MCDADE asked if "old girl" gave her some money and ALLEN stated, "Yep, she gave me U/I three hundred." MCDADE asked if she ("old girl") was at the house and ALLEN replied she was not and was at "Greenfield." MCDADE then called her a "stupid ass."

64. Based on the investigation to date, case agents believe MCDADE sent others including, but not limited to, ALLEN and JONES to Chicago, IL to obtain narcotics from MCDADE's source of supply. As previously mentioned, case agents believe MCDADE's source of supply utilizes telephone number **Target Cell Phone 8** which is affiliated with ERVING. These individuals then transport the narcotics to the greater-Milwaukee area for further distribution. Therefore, in this call, case agents believe ALLEN told MCDADE that she was on her way to Chicago to meet with MCDADE's source of supply to obtain narcotics because ERVING instructed ALLEN to drive there ("I'm on my way to Chicago, he just told us to come on now").

65. Case agents conducted telephone toll analysis on ALLEN's telephone number, **Target Cell Phone 8**. Case agents observed that, on January 9, 2026, **Target Cell Phone 8** was in contact with **Target Cell Phone 7** 18 times from approximately 4:23 p.m. through approximately 10:05 p.m. Case agents conducted a query of the WIDOT and discovered that ALLEN is the registered owner of **a black 2023 Chrysler Pacifica, bearing Wisconsin license plate AZW-6485, VIN: 2C4RC1BG5PR510973 (Target Vehicle**). Therefore, case agents conducted a query of license plate readers in the Chicagoland area. This query identified that on June 9, 2025, **Target Vehicle** was traveling southbound on I-90 at W. Chicago Avenue in Chicago, IL at approximately

9:43 p.m. Per the license plate readers, **Target Vehicle** continued southbound and was ultimately observed southbound on I-90 at W. 59th Street at approximately 9:51 p.m., which was the southernmost license plate reader that captured **Target Vehicle**. Approximately 17 minutes later, at 10:08 p.m., **Target Vehicle** was observed traveling northbound on I-90 at W. 59th Street. A query of the WIDOT revealed ERVING's address on his Illinois driver's license is listed as 6318 S. Aberdeen Street, Chicago, IL which is near the license plate reader at I-90 and W. 59th Street. As mentioned in the previous paragraph, the were 18 calls between **Target Cell Phone 8** and **Target Cell Phone 7** on January 9, 2026. Among these, some of the calls were as follows:

a. 9:46 p.m.: **Target Cell Phone 8** outgoing to **Target Cell Phone 7**
b. 9:52 p.m.: **Target Cell Phone 8** outgoing to **Target Cell Phone 7**
c. 10:02 p.m.: **Target Cell Phone 8** incoming from **Target Cell Phone 7**
d. 10:05 p.m.: **Target Cell Phone 8** outgoing to **Target Cell Phone 7**

66. Therefore, based on the recorded jail call during which ALLEN told MCDADE, "I'm on my way to Chicago, he just told us to come on now," as well as license plate reader for **Target Vehicle** and telephone toll data between **Target Cell Phone 8** and **Target Cell Phone 7**, case agents believe ALLEN, driving **Target Vehicle** traveled to, or near, ERVING's residence to meet with ERVING and obtain narcotics, then traveled back northbound to the greater-Milwaukee area. In addition, case agents believe ALLEN used her phone, **Target Cell Phone 8**, to communicate with ERVING at **Target Cell Phone 7** and coordinate this meeting.

67. On January 10, 2026, at approximately 9:54 a.m., MCDADE called ALLEN at **Target Cell Phone 8** from the Milwaukee House of Corrections (Jail call # 7435301310 _2025018513_01-10-2026_09-54-46_1-262-330-2333). An unidentified male (UM) answered the phone and MCDADE asked if ALLEN was asleep. The UM advised that ALLEN was asleep and

asked MCDADE if he should wake her up. MCDADE told UM to wake ALLEN up and then asked, "Y'all make it back safe?" The UM replied, "Yeah, yeah, [U/I] everything good." ALLEN then got on phone and said, "Hello." MCDADE laughed and suggested how tired ALLEN must be. MCDADE stated, "Yeah, that's good you all met him. You met him, huh? He cool?" ALLEN acknowledged, "Uh-huh." MCDADE said, "Yeah, he cool." As the call continued, MCDADE asked ALLEN if she found the "thingy" yet and ALLEN stated that she thought somebody put it in her closet and would look for it.

68. Based on this call, case agents believe the UM traveled to Chicago with ALLEN to meet with ERVING to obtain controlled substances the previous day. MCDADE asked the UM if the UM made it back from Chicago safely ("Y'all make it back safe?") and the UM confirmed they did ("Yeah, yeah, [U/I] everything good"). Furthermore, once ALLEN got on the phone, MCDADE confirmed that ALLEN and the UM met with ERVING ("Yeah, that's good you all met him. You met him, huh? He cool?") and ALLEN confirmed they had.

69. On January 18, 2026, at approximately 11:22 a.m., MCDADE called ALLEN at **Target Cell Phone 8** from the Milwaukee House of Corrections (Jail call # 743939236 _2025018513_01-18-2026_11-22-10_1-262-330-2333). At approximately 9 minutes 52 seconds into the call, ALLEN asked MCDADE, "Who supposed to be goin' up north with Ra Ra?" MCDADE replied, "I don't know, shit. Who going?" ALLEN replied, "Not me." MCDADE stated, "You going to take that ride." MCDADE then stated, "Ask him, ask him who there." ALLEN was talking to somebody in background and ALLEN stated, "Uncle Junior." MCDADE replied, "Yeah, they can go." ALLEN told MCDADE, "They gotta take a phone." At 10 minutes 58 seconds MCDADE asked, "What time they leaving today? What time they leaving?" ALLEN asked, "Huh?"

MCDADE repeated, "What time they leaving?" ALLEN advised, "I don't know, I gotta get them a phone first, cause they ain't finna use my shit." ALLEN then stated, "But then again, they can, 'cause I ain't gotta do nothing but sleep all while the going up there." ALLEN then yelled in background, "Y'all can take my phone U/I."

70. Based on the investigation thus far, case agents believe MCDADE has individuals transport narcotics to the Campbellsport area (Fond du Lac County), which is north of Milwaukee. Therefore, case agents believe MCDADE inquired as to who was going to transport the narcotics to Campbellsport ("Who supposed to be goin' up north with Ra Ra?"). ALLEN advised she was not going ("Not me") but eventually indicated that whoever does go can utilize her phone ("Y'all can take my phone U/I").

71. On January 19, 2026, at approximately 7:28 p.m., MCDADE called ALLEN's phone, **Target Cell Phone 8**, from the Milwaukee House of Correction (Jail call # 744027894 _2025018513_01-19-2026_19-28-35_1-262-330-2333). A UM answered and MCDADE identified the UM as "Uncle Junior." Case agents are still attempting to fully identify "Uncle Junior." Throughout the call, case agents heard that MCKNIGHT was with another individual, whom MCDADE referred to as "Brother-in-Law." Case agents believe "Brother-In-Law" is Kerry HOWELL (DOB: XX-XX-54), who was previously identified during a West Allis PD investigation into an overdose death (Case #24-017511). "Uncle Junior" advised, "We almost up there, man." MCDADE asked, "How far y'all away?" "Uncle Junior" advised, "He had a problem with the tire." MCDADE again asked, "How far y'all away?" and the "Uncle Junior" advised, "About seven miles." MCDADE said, "Damn, you ain't gonna be there before 7:40, huh?" "Uncle Junior" said they were about ten minutes away. MCDADE told UM that he might as well stay on the phone.

"Uncle Junior" soon advised that they were getting off at the next exit. MCDADE then spoke to somebody in the background and asked who was next on the phone. Then MCDADE stated, "This an important call, I'm gonna have to give him like ten dollars on the canteen. I need this call." "Uncle Junior" advised, "We getting off now." "Uncle Junior" asked MCDADE how many minutes he had left and MCDADE tells UM he has about ten minutes. MCDADE clarifies with "Uncle Junior" about if they just exited and that they are probably five minutes from the house. "Uncle Junior" confirmed they were five minutes away.

72. At 12 minutes 22 seconds into the call, "Uncle Junior" said, "We here." MCDADE acknowledged, "Okay." In the background, case agents could hear a horn honking and MCDADE asked if "Uncle Junior" was going in and "Uncle Junior" said this was his first time up there. As the call continued, it sounded to case agents as if "Uncle Junior", and HOWELL were attempting to make contact with "Lisa" and/or "Bird" inside a residence. Case agents are still attempting to more fully identify "Lisa." At one point, an individual identified as "Tom" arrived and assisted "Uncle Junior" and HOWELL with making contact with "Lisa" and "Bird." Eventually, they were able to get in contact with "Lisa" who then spoke on the phone with MCDADE. Soon thereafter, MCDADE reached the time limit on his call and the call ended.

73. Based on the investigation thus far and recorded jail calls between MCDADE and "Lisa," case agents believe "Lisa" is a narcotics customer of MCDADE's. Therefore, case agents believe "Uncle Junior" and HOWELL took ALLEN's phone, **Target Cell Phone 8**, with them as they drove to Campbellsport, WI to deliver narcotics to "Lisa."

74. On January 21, 2026, at approximately 3:04 p.m., MCDADE called ALLEN at **Target Cell Phone 8**, from the Milwaukee House of Correction (Jail call #

744102904_2025018513_01-21-2026_15-04-25_1-262-330-2333). At about 9 minutes 8 seconds into the call, ALLEN said, "I gotta wait, cuz uh, this weekend I'mma send "Brother-in-Law" to Chi-Town." MCDADE acknowledged. ALLEN continued, "Yeah, so I have to get him straight." MCDADE stated, "Ask Brother-in-Law and Uncle Junior, can they go up, go, go, go up that way [U/I] tomorrow or Friday." ALLEN asked, "Where?" MCDADE replied, "Up there where they went." ALLEN said they could not because she and "Brother-in-Law" were going to see Lola tomorrow.

75. As mentioned previously, case agents believe "Brother-in-Law" is HOWELL, and that "Chi-Town" is a nickname for Chicago, IL. Therefore, case agents believe ALLEN informed MCDADE that HOWELL would travel to Chicago that weekend to obtain narcotics from ERVING (this weekend I'mma send "Brother-in-Law" to Chi-Town"). MCDADE asked if HOWELL and "Uncle Junior" could travel to Campbellsport the next day or Friday to deliver narcotics to "Lisa" and/or obtained narcotics-related proceeds from her.

76. On February 13, 2026, the Honorable William E. Duffin, United States Magistrate Judge, Eastern District of Wisconsin signed a warrant authorizing the electronic surveillance of ALLEN's telephone (262) 330-2333 and ERVING's telephone (773) 981-6881. These warrants were executed on that same date. Evidence obtained from the electronic surveillance is consistent with MCDADE, ALLEN, ERVING and others engaging in drug trafficking conduct; however, have since expired.

77. On February 22, 2026, case agents reviewed a jail video call from MCDADE to JONES using the "Home Wave" application that occurred on February 12, 2026. The time stamp on the screen of this video call was 05:48:10 p.m. During this call, it was apparent to case agents

that JONES was driving in a vehicle. At the beginning of the call, MCDADE asked, "You read my e-mail?" JONES replied, "I can't because I was been driving." MCDADE also asked who JONES was with and she replied that she was with her mother. Approximately 7 minutes and 17 seconds into the call, case agents observed a highway sign in the background of the video. Based on experience and observations, the sign appeared to be a Chicago-area Express Lane sign. Case agents know that JONES is one of multiple people who MCDADE uses to conduct narcotics pickups from his source(s) in Chicago, believed to be ERVING. Case agents also know that JONES is known to drive Target Vehicle 2 based on prior surveillance.

78. Case agents reviewed electronic surveillance footage from the area identified by case agents as ERVING's residence, 6318 S. Aberdeen Street, Chicago, Illinois, from February 12, 2026. At approximately 6:16 p.m., case agents observed what appeared to be a gray Nissan Pathfinder SUV, consistent with Target Vehicle 2, stop in front of ERVING's residence. A black female with her hair in a short ponytail exited the passenger side of the vehicle, which was consistent with Target Vehicle 2 and walked toward ERVING's residence, out of the view of surveillance. The SUV, consistent with Target Vehicle 2, then departed the area northbound, away from ERVING's residence. Case agents believe the individual who exited the Pathfinder was consistent with JONES.

79. At approximately 7:15:57 p.m., electronic surveillance revealed that a dark sedan stopped in front of ERVING's residence at which time its hazard lights were activated. At approximately 7:16:26 p.m., the same female, who was consistent with JONES, appeared from ERVING's residence and entered the rear passenger side of the awaiting vehicle. This vehicle drove northbound away from the residence. Case agents believe that this was a rideshare vehicle (i.e. Uber or Lyft) and that JONES had left in it.

80. Case agents also checked license plate readers for Target Vehicle 2 for February 12, 2026. This query revealed that Target Vehicle 2 was captured on a highway camera on February 12, 2026, at approximately 3:14 p.m., travelling southbound on I-94 near Lake Forest, Illinois. At approximately 4:06 p.m., Target Vehicle 2 was also captured on a highway camera traveling southbound on I-90/I-94 at W. Chicago Avenue. This travel was in the direction of ERVING's residence.

81. Based on JONES' statement to MCDADE on the recorded video all, using (612) 525-0135, which indicted JONES was driving, case agents' observation that JONES appeared to pass a sign on I-94 in Illinois while she was driving, electronic surveillance, and traffic cameras showing Target Vehicle 2 in Chicago, case agents believe JONES traveled to Chicago in Target Vehicle 2. In addition, case agents believe JONES was dropped off at ERVING's residence to obtain narcotics on behalf of the MCDADE DTO. JONES' travel is consistent with known previous travels of other suspects in this investigation that are suspected of having traveled to ERVING's residence to obtain narcotics.

82. Case agents conducted telephone toll analysis and observed that JONES did not appear to contact ERVING on February 12, 2026, using (612) 525-0135. Therefore, case agents believe based on training and experience, that ERVING and JONES made contact with each other utilizing non-conventional methods such as FaceTime, iMessage, or other encrypted applications, none of which would appear on telephone tolls. Case agents are aware that those engaged in drug trafficking will often use non-conventional methods such as FaceTime, iMessage, or other encrypted applications, because drug traffickers believe they can evade law enforcement when using these communication methods.

83. On February 26, 2026, the Honorable Stephen Dries, United States Magistrate Judge, Eastern District of Wisconsin, signed a warrant authorizing law enforcement to install a GPS device on JONES' vehicle a gray, 2014 Nissan Pathfinder, bearing Wisconsin license plate VK5729 (Target Vehicle 2).

84. Case agents have continued to monitor jail calls placed by MCDADE. During several of these calls, ALLEN mentioned getting a new vehicle. For instance, on February 23, 2026, at approximately 4:04 p.m., MCDADE called ALLEN at (262) 330-2333, from the Milwaukee House of Correction (Jail call # 745760768_2025018513_02-23-2026_16-04-02_1-262-330-2333_9108). During this call, ALLEN said, "We gonna get this truck in the morning, put the rest of this money up for you." MCDADE replied, "That's what's up."

85. On February 25, 2026, at approximately 9:25 a.m., MCDADE called ALLEN at (262) 330-2333, from the Milwaukee House of Correction (Jail call # 745829634_2025018513_02-25-2026_09-25-14_1-262-330-2333_9108). During this call, MCDADE asked, "After this, what time you want me to call you?" ALLEN replied, "Naw baby, you can call me anytime, dude. I'm saying after I'm done talking to you I'm finna go jump in the shower, put on some clothes, call the U/I, go get my whip, go get it registered, run down there put some money on your books…"

86. Case agents know "whip" is a term often used to refer to a vehicle. Therefore, case agents believed ALLEN informed MCDADE that she was going to get her new vehicle that day and register it with the Department of Motor Vehicles. Case agents subsequently conducted a query with the Department of Transportation and discovered that on this same date, February 25, 2026, ALLEN registered a bronze 2009 Nissan Murano, currently bearing Wisconsin license plate BCX-5254, VIN: JN8AZ18W99W152835 (Murano) to herself at 2843 North 10th Street, Milwaukee, Wisconsin.

87. On February 27, 2026, case agents conducted surveillance at ALLEN's residence, 2843 North. 10th Street, Milwaukee, Wisconsin. At approximately 1:11 p.m., case agents observed a bronze Nissan Murano (Murano) parked directly behind her residence. This Murano displayed temporary Wisconsin license plate Y5912J in its rear window (Murano). Case agents conducted a query with the WI DOT and discovered this temporary license plate was registered to above-mentioned vehicle (Murano). Case agents believe ALLEN was initially provided with the temporary license plate (Y5912J) for Murano until she could receive the permanent license plates (BCX-5254) for Murano.

88. Case agents believe now that ALLEN has a vehicle again (Murano), MCDADE will continue to employ her to meet with ERVING in Chicago, IL and travel to other locations to engage in drug trafficking matters on behalf of the MCDADE's DTO. For example, during the February 25, 2026, ALLEN stated she was going to "put the rest of this money up for you." Based on training, experience, and the investigation into the DTO, case agents believe this statement refers to ALLEN securing MCDADE's drug proceeds. In the other call from the same date, ALLEN states she will "run down there" in order to "put some money on your books…" Based on training, experience, and the investigation into the DTO, case agents believe this statement refers to ALLEN driving Murano to the House of Correction ("run down there") in order to provide MCDADE with his drug proceeds. Case agents are aware that the term "books" often refers to an inmate's account, which allows inmates to make telephone calls and purchase items. Based on this information, case agents believe ALLEN is placing drug proceeds on MCDADE's inmate account to allow MCDADE to make additional telephone calls, including calls related to drug trafficking, or obtain items while in custody ("put some money on your books…").

89. On March 8, 2026, STAIR (TARGET TELEPHONE 3) had phone contact with MCDADE, who called by way of third party from a recorded jail phone at the Milwaukee County House of Corrections where he is currently in custody. Case agents reviewed telephone tolls and MCDADE's jail records and determined that Amber VALADEZ used phone number 414-305-4012 to assist MCDADE in calling TARGET TELEPHONE 3. (Jail Call: 746382304_2025018513_03-08-2026_11-41-50_1-414-305-4012_9108). During this recorded jail call VALADEZ and MCDADE spoke about where VALADEZ is staying and she begins a conversation about person who was rumored to have told on MCDADE, which lead to his current arrest. MCDADE became animated and indicated a desire to know who was speaking about MCDADE. VALADEZ says that it was "Cut" that told her about MCDADE. MCDADE stated that those people hate him. After speaking about this matter MCDADE asks VALADEZ to make 3-way-call the number 414-732-3682 (TARGET TELEPHONE 3). MCDADE stated I need to talk to my boss "the millionaire Sam". STAIR and MCDADE discuss MCDADE's case and bail, and how they were partners. After the call with STAIR, MCDADE provided VALADEZ a the phone number for "Slim" of 414-295-5951. Subscriber information for that phone number showed it was attached to Wesley BYNUM at the address of 710 South 21st Street, Milwaukee, Wisconsin.

**MCDADE**: Hello?
**VALADEZ**: Yeah.
**MCDADE**: Yeah, call Slim, four (4), one (1), four (4), two (2), nine (9), five (5), fifty-nine (59), fifty-one (1). (414-295-5951)
**VALADEZ**: Two (2), nine (9), five (5), fifty (50)- fifty-four (54) fifty-one (51)?
**MCDADE**: No.

MCDADE and Valadez continue the conversation about her speaking to "Cut" and VALADEZ states that "Slim" did not pick up. VALADEZ asks why he needs to speak to "Slim" and then he

states it is because Slim got that number. MCDADE then asks that she call Lisa. The call ends shortly after this.

90. On February 24, 2026, at approximately 12:51 pm case agents was conducting surveillance at 729 South 21st Street, Milwaukee, Wisconsin and observed a black male, wearing all black clothing with long black dreads and a black mask pulled down under his chin, exit 710 South 21st Street. The male walked to the street and met a black Acura SUV that was parked in front of 710 South 21st Street. The black male handed a person in the passenger seat a small baggie with an off-white substance. The black male was then observed receiving currency from the front passenger and placing it into his front pocket. The black male then returned to 710 S 21st Street and entered the front door. Based on my training and experience, this observation was of a hand-to-hand drug trafficking transaction. At the conclusion of surveillance, case agents reviewed a jail booking photograph of Wesley BYNUM and confirmed that the black male observed conducting the hand-to-hand drug transaction was BYNUM.

91. Also, on February 2, 2026, case agents observed BYNUM (wearing a face mask) exit the door to 710 South 21st Street, Milwaukee, Wisconsin, approach a vehicle stopped directly in front of the residence, reach into the front passenger window, and engage in another hand-to-hand transaction before returning to the door of 710 South 21st Street, Milwaukee, Wisconsin and re-entering the residence. Although BYNUM was wearing a face mask, case agents were able to confirm from his stature and distinct long dread locks that this was the same male observed in previous days engaging in similar drug transactions. Based on my training and experience, BYNUM's observed conduct is consistent with a hand-to-hand drug transactions.

92. Case agents further knows that 710 South 21st Street, Milwaukee, Wisconsin is owned by S2 Real Estate and is a well known "trap house" formerly run by MCDADE, during the summer of 2024. Throughout MCDADE's period of incarceration, MCDADE was consistently in contact with BYNUM, with over forty calls made or attempted with MCDADE's PIN. Given MCDADE's prior operation of 710 South 21st Street as a trap house as part of his DTO, MCDADE's continued contact with BYNUM during his incarceration, and the observation of BYNUM conducting hand-to-hand transactions from that residence during MCDADE's incarceration, case agents believe that BYNUM took over the operation of 710 South 21st Street (owned by STAIR) as a trap house. The continued operation of that location as a trap house and MCDADE's continued contact with STAIR during his incarceration further demonstrates STAIR's continued profiting from the maintenance of his properties for the purpose of drug trafficking. Case agent believes that MCDADE is continuing to profit from these S2 Real Estate owned "trap houses" that continue to engage in drug trafficking.

93. Case agents also reviewed record jail calls between MCDADE and BOFFIL, demonstrating the MCDADE DTO ongoing drug trafficking. On February 1, 2026, at approximately 11:01 a.m., MCDADE, while incarcerated at the Milwaukee County Community Reintegration Center, placed a recorded jail call to Alberto BOFFIL (aka "Nephew" or "Neph") at (262) 234-8917. Portions of the conversation ensued as follows:

> **MCDADE**: Yeah, where, where you at, Neph?
> **BOFFIL**: At home.
> **MCDADE**: Oh you said at the house?
> **BOFFIL**: Yep.
> **MCDADE**: Did you call Slim [BYNUM]?
> **BOFFIL**: No, not yet.

**MCDADE**: Yeah. Yeah. Make sure you smack the fuck outta Mike, too. That's what I was tellin' you.
**BOFFIL**: I will.
…..
**MCDADE**: I'ma tell Vicky, I'ma tell Vicky to give you a couple dollars, dog. I'ma tell Vicky to give you a couple dollars.
**BOFFIL**: Yup.
…..
**MCDADE**: That's what I'm telling you. Like, where Slim, when you talk to Slim, like Slim, "Where the fuck that's at?" You gonna see, you gonna be like, "What the fuck?" They got J-Rock, he in jail for a high-speed chase, dope, um… But yeah, where Slim, where Slim gon' take you to, you're gonna be like, "What the fuck? Who house…it's a straight 'bando.
**BOFFIL**: Slim's an idiot
**MCDADE**: Yeah so, like, if like Vicky, you know, like fifteen hundred-fifteen hundred, a thousand dollars a day kinda shit. I'm like man, be careful. The police, the police, the police came over there but they was like, "We can't put y'all out, 'cause it's y'all, y'all, y'all um, squatters."

94. Case agents know that "Slim" is a nickname for BYNUM, and therefore this call confirmed that MCDADE, BOFFIL, and BYNUM all know each other. MCDADE also said he was going to have ALLEN give BOFFIL money ("I'ma tell Vicky to give you a couple dollars"). Case agents also know that "'bando" is short for "abandoned" and is a term used by MCDADE to refer to a vacant or abandoned house that he and others use to distribute narcotics from. MCDADE described the house BYNUM distributes from as a 'bando and if BYNUM showed the house to BOFFIL, BOFFIL would be surprised at the state of the house ("where Slim gon' take you to, you're gonna be like, "What the fuck? Who house…it's a straight 'bando"). Next, MCDADE implied that BYNUM and ALLEN work together and make $1,000-$1,500 per day selling narcotics ("Yeah so, like, if like Vicky, you know, like fifteen hundred-fifteen hundred, a thousand dollars a day"). MCDADE expressed concern and told BYNUM and/or ALLEN to use caution to avoid police contact ("I'm like man, be careful").

95. On March 21, 2026, case agents established surveillance near 710 South 21st Street. At approximately 12:23 p.m., surveillance units observed BYNUM, who was standing on the front porch, lean over the porch's railing and conduct a suspected hand-to-hand narcotics transaction with a black male on crutches who was subsequently identified as Denzel M. JONES. Case agents know D. JONES was born in Memphis, TN and his nickname is "Memphis." D. JONES walked to a nearby a blue Toyota, bearing Wisconsin license plate AYE-3620 (Toyota), and conducted a suspected hand-to-hand narcotics transaction with an occupant of the Toyota. D. JONES then walked to a nearby Kia minivan, bearing Wisconsin license plate X4021W (Kia), and appeared to conduct another suspected hand-to-hand narcotics transaction with an occupant of the Kia. Case agents believe BYNUM retrieved the narcotics from inside 710 South 21st Street and provided them to D. JONES. D. JONES then sold these narcotics to drug customers.

96. Case agents remained in the area and observed BYNUM conduct several additional suspected narcotics transactions with individuals near BYNUM's residence. Throughout this surveillance, case agents also observed BYNUM on the second story balcony of his residence several times and they observed BYNUM walk in/out of the door to 710 South 21st Steet.

97. Case agents first observed that three separate males were making contact at 710 South 21st Steet and speaking with BYNUIM (Figure 1) as he stood on the upper balcony at approximately 12:28 PM.



Figure 1

98. At approximately 12:28 PM BYNUM eventually exits and meets with some of the other males that were communicating with him from the Upper porch of 710 South 21st Steet, and he subsequently engages in hand-to-hand transactions with these males, which based on my training and experience, was consistent with a hand to hand drug transaction (Figures 2, 3, and 4).



Figure 2



Figure 3



Figure 4

99. On February 13, 2026, case agents obtained a federal GPS tracking warrant for ALLEN's bronze, 2009 Nissan Murano, bearing Wisconsin temporary license plate Y5912J, also assigned Wisconsin license plate BCX-5254, VIN: JN8AZ18W99W152835 (Murano). Case agents reviewed data pertaining to the location of ALLEN's Murano, which was consistent with ALLEN engaged in drug trafficking with BYNUM at 710 South 21st Street, Milwaukee, Wisconsin.

100. On March 18, 2026, at approximately 9:02 a.m., the Murano departed ALLEN's residence at 2843 North 10th Street, Milwaukee, Wisconsin. At approximately 9:24 a.m., the Murano stopped in the vicinity of 710 South 21st Street. The Murano remained in this area until

approximately 9:42 a.m. As mentioned above, BYNUM is a known drug trafficker with MCDADE DTO, who sells narcotics out of 710 South 21st Street, Milwaukee, Wisconsin, which is a residence owned by S2 Real Estate. Based on their investigation to date as well as intercepted recorded jail telephone calls, case agents believe BYNUM is supplied narcotics by MCDADE and MCDADE's associates. Therefore, case agents believe ALLEN, or somebody using the Murano, met with BYNUM to deliver drugs to BYNUM and/or obtain drug proceeds from him.

101. In addition, on March 27, 2026, at approximately 6:11 a.m., the Murano departed ALLEN's residence at 2843 North 10th Street, Milwaukee, Wisconsin. At approximately 6:27 a.m., the Murano stopped in the vicinity of 710 South 21st Street. The Murano remained in this area until approximately 6:53 a.m. Case agents again believe ALLEN, or somebody using Murano, met with BYNUM to deliver drugs to BYNUM and/or obtain drug proceeds from him.

102. On April 2, 2026, at approximately 4:14 p.m., the Murano departed ALLEN's residence at 2843 North 10th Street, Milwaukee, Wisconsin. At approximately 5:33 a.m., the Murano stopped in the vicinity of 710 South 21st Street. At approximately 6:10 p.m., the Murano returned to 2843 North 10th Street, Milwaukee, Wisconsin. Case agents again believe ALLEN, or somebody using the Murano, met with BYNUM to deliver drugs to BYNUM and/or obtain drug proceeds from him.

103. Case agents conducted toll analysis on ALLEN's telephone **(262) 330-2333** ("**Target Cell Phone 8**"). From February 1, 2026, through April 3, 2026, **Target Cell Phone 8** was in contact with BYNUM's telephone (414) 295-5951 seventy-seven (77) times, with the most recent contact on April 2, 2026. Based on the above-mentioned calls and analysis of the location of ALLEN's Murano, case agents believe ALLEN remains involved in furthering MCDADE's drug trafficking

network. Case agents believe ALLEN stores and distributes narcotics at her residence, and secures drug-related proceeds at her residence. In addition, case agents believe ALLEN retrieves drug proceeds from other individuals who distribute narcotics for MCDADE including, but not limited to, BYNUM.

104. Case agents have also reviewed electronic surveillance, pole camera, and conducted physical surveillance at ERVING's residence 6318 South Aberdeen Street, Chicago, IL and have continued to observe conduct consistent with ERVING engaged in drug trafficking. During surveillance of 6318 South Aberdeen Street, case agents observed dozens of people in and around the residence. The people do not reside at the residence but appear to be from the same neighborhood as they are usually travelling on foot. These people appear to provide security and property care for ERVING's residence. Case agents have observed numerous instances of what they believe to be hand-to-hand drug transactions occurring on the north side of ERVING's property under the rail tracks. The same people conducting hand-to-hand drug transactions have been observed regularly conversing with ERVING, sometimes daily, via electronic surveillance. Surveillance has also determined that the same people under the rail tracks appear to act as security and lookouts for ERVING. They will move in large groups occupying the east, west, and north sides of ERVING's residence.

105. Case agents have observed several of the same people walking through ERVING's property. Those people will pick up trash, rake the grass, wash his cars, and move items around the property. On several occasions, those people were observed removing ERVING's trash bins and taking them to an unknown location making it problematic for case agents to attempt to perform a trash pull. Over conducting several months of surveillance of ERVING's residence, case agents

believe ERVING is utilizing street dealers, vagrants, and drug users to provide counter surveillance and security of his residence. Additionally, case agents have observed multiple vehicles drive circles around ERVING's block. Those vehicles have been observed on surveillance stopping at ERVING's residence previously and during the daytime, it appears as though the vehicles are conducting a perimeter check of the area. For example, when a Chicago Police squad car enters the area, the people under the rail track will move to the west of the property and wait until the squad car departs the area. Case agents have observed the area be congested with foot traffic and vehicles, and once a squad car is observed in the area all people and vehicles clear out of the area. Indeed, not all of the observations made during surveillance of 6318 South Aberdeen Street, Chicago, IL are listed in this affidavit, however, your affiant has identified several examples of suspicious activity at 6318 South Aberdeen Street, explained in detail below:

106. On February 15, 2026, investigators conduct electronic surveillance at 6318 South Aberdeen Street, Chicago, IL. At approximately 4:35 p.m., a purple Buick parked in front of the residence, bearing IL registration EM17007. A check of the registration plate through the Illinois Department of Transportation listed to Ovester Moore with a listed address of 5340 N Kanemore, Chicago, Illinois. At approximately 6:21 p.m. three black males exited the south side door of 6318 South Aberdeen Street and walked toward the street. One male, identified as ERVING, was wearing black pants and a white jacket. ERVING's hair was in a long-braided ponytail. One male wearing light colored pants, a dark sweatshirt, and a knit hat was carrying a plastic shopping bag. The third male had a slender build and was wearing black pants, a red-hooded sweatshirt, and a ballcap. At 6:23 p.m. the male wearing the red sweatshirt opened the trunk lid of the purple Buick. At 6:24 P.M. the three males congregated near the trunk of the purple Buick. Investigators noted a red Chevrolet

Caprice among the vehicles.

107. At approximately 6:38 p.m., ERVING and the male in the red sweatshirt were loitering near the passenger side of the red Chevrolet Caprice with the front passenger side door open. They both entered the vehicle through the front passenger side door. A possible fourth/different male, wearing a blue, red, and white sports team jacket (Chicago Cubs?) entered the driver door of the red Chevrolet Caprice. They remained inside the red Chevrolet Caprice together for approximately 14 minutes.

108. At approximately 6:53 p.m., a dark colored SUV parked across the street from 6318 South Aberdeen Street. A black female wearing dark pants and a white jacket exited the driver's door. She had long black braided hair. During that time, Erving and the male wearing the red sweatshirt exited the Caprice. Erving leaned into the driver's compartment of the dark colored SUV and eventually entered and closed the door. Then, at approximately 6:54 p.m., the black male wearing the red sweatshirt exited the Caprice and walked to the purple Buick sedan parked across the street from 6318 South Aberdeen Street,. The black male wearing the red sweatshirt was observed opening the trunk of the sedan and then removing two (2) white brick-shaped objects. The black male wearing the red sweatshirt was observed walking back to the red Chevrolet Caprice, at which time he entered the passenger seat. At approximately 6:55 p.m., agents observed ERVING drive the SUV from the area, followed by the red Chevrolet Caprice. The SUV continued driving north on S. Aberdeen St across W. 63rd St., while the red Chevrolet Caprice turned east onto W. 63rd St.

109. Based on my training, experience, and knowledge of the investigation, agents believe that the two (2) white brick like objects observed during this surveillance were kilogram quantities

of illicit substances such as cocaine and/or fentanyl. Case agents are aware that narcotics traffickers conceal both illicit substances and narcotics proceeds in different locations, including vehicles/vehicle trunks, to conceal and safeguard from law enforcement and rival drug traffickers. Because ERVING, originally was observed exiting 6318 South Aberdeen Street and because ERVING had contact with all parties on scene, and because the nature and manner of ERVING's interactions with these individuals, agents believe that ERVING was involved with the sale and distribution of suspected kilogram quantities of narcotics.

110. On March 1, 2026, at approximately 9:01 a.m., investigators conduct electronic surveillance at 6318 S Aberdeen Street, Chicago, IL. ERVING exited t6318 S Aberdeen Street and walked towards the previously documented Toyota Camry (belonging to ERVING). ERVING was observed retrieving an object from the trunk of the vehicle. ERVING then appeared to place an object underneath his shirt, and ERVING returned to 6318 S Aberdeen Street. At approximately 11:46 a.m., ERVING exited the residence and entered the Toyota Camry. At approximately 11:50 a.m., ERVING exited his Toyota and reentered the side door of 6318 S Aberdeen Street. Approximately a minute later, ERVING exited 6318 S Aberdeen Street and made contact with an unknown male, on the sidewalk. The unknown male originated from the rear alley of 6318 S Aberdeen Street. Agents observed ERVING hand an unknown object to the unknown male. Then, at approximately 11:52 a.m., a silver hatch back vehicle parked across the street from 6318 S Aberdeen Street**.** The driver exited the silver vehicle and had a conversation with ERVING. ERVING then was observed entering his Toyota Camry as he conversated with the driver of the silver vehicle. The unknown male driver of the silver vehicle reached into the Toyota, occupied by ERVING, and appeared to conduct a hand-to-hand transaction with ERVING. The unknown male

driver returned to the silver vehicle and drove from the area. ERVING then returned to6318 S Aberdeen Street.

111. Based on your affiant's training, experience, and knowledge of the investigation, ERVING was engaging in short term contacts with multiple people. These short-term contacts are indicative of narcotics related activity and is common among narcotics trafficking when both distributing narcotics and collecting drug proceeds. Indeed, ERVING has been observed on multiple occasions make short-term contact with the "red SUV." The observations above coincide with agents belief that ERVING is supplying other, lower tier narcotics distributors with illegal substances for distribution in the neighborhood of 6318 S Aberdeen Street.

112. On April 4, 2026, investigators conduct electronic surveillance at 6318 S Aberdeen Street, Chicago, IL. At approximately 12:04 a.m., an unknown make/model silver or gold SUV parked on the street in front of the ERVING's Porsche. An unknown female exited the driver's door wearing a white or light-colored jacket and walked through the front gate of the residence. Due to the lighting conditions and orientation of the camera it is unknown when she entered the residence. Then, at approximately 8:51 A.m., that same female exited the south side door of the residence wearing white shoes, red pants, and white jacket. She had long braided black hair. She entered the driver's door of the silver or gold SUV and drove from the area.

113. At approximately 9:06 a.m., ERVING left the residence and drove from the area, in his Toyota Camry. At 9:20 a.m., the Toyota returned to 6318 S Aberdeen Street. ERVING did not exit the vehicle. The Toyota (driven by ERVING) pulled away at 9:32 a.m. and turned west onto the alley. Seconds later, the Toyota Camry stopped and ERVING met with four M/Bs where the two alleys intersect at the N/W corner of 6318 S Aberdeen Street. The Toyota then continued west

in the alley.

114. At approximately 9:56 a.m., A white city bus stopped at the intersection of W. 63rd St and S. Aberdeen St. A unknown black female exited the bus and walked south on the sidewalk toward the ERVING's black Toyota. She was wearing black calf-high boots, gray pants, a white shirt, and a black jacket. She had shoulder length wavy black hair and a large black handbag or purse. She arrived at the black Toyota at 9:57 a.m. and immediately reached into the ERVING's vehicle through the driver's window. She later handed something to ERVING through the open window. She then received something from ERVING through the open window of the Toyota and walked away from the vehicle. She walked west onto the alley. ERVING exited his vehicle at approximately 10:03 a.m. and walked onto the sidewalk. ERVING subsequently entered 6318 S Aberdeen Street. The unknown black female entered a separate city bus and left the area, ending short term contact with ERVING. Then, at approximately 11:09 a.m., black SUV parked across the street of 6318 S Aberdeen Street. A unknown black male exited the vehicle and walked towards 6318 S Aberdeen Street. ERVING exited 6318 S Aberdeen Street and made contact with the black male. Both ERVING and the black male then entered t 6318 S Aberdeen Street. Approximately one (1) minute later both ERVING and the black male exit the residence. The black male then reentered the SUV, and drove from the area, ending his short term contact with ERVING. At 11:12 a.m., ERVING is observed in conversation with an unknown black male, riding a bicycle, along with another black male pedestrian (on foot). A short time later, a white Chevy sedan arrived and an unknown black female exited the white Chevy, and walked towards ERVING and the black male on the bicycle. At approximately 11:18 a.m., the black male on the bicycle left as ERVING and the black female entered the residence. At approximately 12:23 p.m., agents observed the black female

exit 6318 S Aberdeen Street, enter the white Chevy, and drive from the area. At approximately 12:48 p.m., ERVING exited 6318 S Aberdeen Street, carrying a blue backpack. ERVING entered his black Toyota Camry and drove from the area. ERVING returned in his Toyota at approximately 15:36 p.m., however, ERVING never exited his vehicle. Then, at approximately 5:47 p.m., ERVING again drove from the area, still in his Toyota Camry. At approximately 9:10 p.m., ERVING returned to 6318 S Aberdeen Street. ERVING exited the Toyota and walked across the street to a person operating a sliver vehicle. Moments later, ERVING returned to t 6318 S Aberdeen Street.

115. On April 11, 2026, electronic and physical surveillance was conducted on ERVING, by agents in Chicago, Illinois. Surveillance was first established at 6318 S Aberdeen, Chicago, IL. At approximately 9:59 a.m., ERVING was observed exiting 6318 S Aberdeen Street, in a blue track suit, carrying something under his right arm. Upon viewing the video, it appeared ERVING is carrying two (2) white brick shaped objects or packages ERVING entered the previously documented Porsche and proceeded to drive toward E. 63rd St. ERVING subsequently made a turn and drove eastbound on W 63rd St. ERVING's vehicle then slowed, as it traveled over the I-94 overpass. As ERVING approached S. Wabash Ave, the vehicle stopped in traffic, in the right lane, and ERVING appeared to be watching each vehicle as they passed ERVING in the left lane. After the majority of vehicles that were behind him passed in the left lane, ERVING continued to drive eastbound to S. Indiana Ave., and made an abrupt left turn to drive northbound on S. Indiana Ave. ERVING continued northbound on S. Indiana Ave., to the northeast corner of the intersection of E. 60th St and S. Indiana Ave., where ERVING parked the vehicle (i.e. Porsche) for approximately two (2)-three (3) minutes.

116. Agents then observed ERVING proceed to drive northbound on S. Indiana Ave., to

the intersection E. 59th St. where ERVING turned eastbound onto E. 59th St. and pulled the vehicle over for a third time, observing traffic and vehicles in the area. After a few moments, ERVING continued eastbound to S. Martin Luther King Dr. where ERVING then turned southbound onto S. Martin Luther King Dr. Agents then observed ERVING disregarding red traffic control signals, running red light signals at the intersection of Martin Luther King Dr. and E 63rd St.

117. Agents' mobile surveillance of ERVING was subsequently terminated, as agents were unable to surveil ERVING without the risk of detection. Based on case agents' observations, case agents believe ERVING was engaging in counter-surveillance techniques typically employed by drug traffickers to evade anyone who may be following him, in a process known as "cleaning". Case agents know from training and experience that this "cleaning," process is used by drug traffickers to make sure that law enforcement cannot follow/surveil them to locations where they are believed to be engaging in illegal activities. Many times, these activities include the attaining/selling of illegal substances, and/or collecting/making payment for illegal substances. Drug traffickers will commonly pull to the side of the road to allow traffic to pass them and they will also disregard traffic control signals or will randomly make sudden turns or stops to ensure law enforcement or other criminals are not following in an effort to evade law enforcement detection. Based upon the observations described above, case agents believe ERVING was engaging in counter-surveillance techniques that led to case agents terminating their surveillance of him on April 11, 2026.

118. Case agents are aware that those engaged in drug trafficking will often use non-conventional methods such as FaceTime, iMessage, or other encrypted applications, because drug traffickers believe they can evade law enforcement when using these communication methods. To date, ERVING still operates, utilizes, and maintains the telephone with the assigned number **(773)**

**981-6881** ("**Target Cell Phone 7**"). As stated previously, that telephone number lists to Jermaine A. ERVING (DOB: XX/XX/1976) of 6318 S. Aberdeen Street, Chicago, IL. Case agents believe, ERVING's telephone **(773) 981-6881** ("**Target Cell Phone 7**"), will provide historical information pertaining to drug trafficking with MCDADE, in the Eastern District of Wisconsin, along with ERVING's ongoing drug trafficking in the greater Chicago area.

119. Case agents believe MCDADE continues to utilize other individuals to obtain and distribute narcotics for him to further his drug trafficking organization. The individual who most has recently done so is ALLEN, who travels herself or sends "Uncle Junior" and HOWELL on her and MCDADE's behalf. These individuals are believed to obtain narcotics from ERVING in the Chicagoland area and transport them back to the greater-Milwaukee area for subsequent distribution. ALLEN utilizes her telephone, **Target Cell Phone 8**, and ERVING utilizes his telephone, **Target Cell Phone 7**, to conduct these transactions.

120. I know that persons who engage in ongoing criminal drug trafficking utilize cellular devices to further their activities. I know that traffickers utilize cellular devices to maintain contact with other affiliates and store information relating to their trafficking offenses. Case agents believed based on the ongoing investigation into the DTO that court authorized electronic surveillance of the **Target Cell Phones**, will assist in the investigation of the DTO. Case agents believe that the historical location data requested for the **Target Cell Phones** will assist in identifying DTO stash locations and corroborating the locations of DTO members during relevant events such as the previously suspected control substance distributions or when conducting control substance deliveries and/or pickups. I believe that the call detail records requested will continue to help identify other DTO members and potential sources of supply. I believe that the requested

prospective location data will continue to assist in proactive surveillance of DTO members and will aid in the identification of DTO members/suppliers, stash locations, and meeting locations.

## TECHNICAL BACKGROUND

121. Case agents believe from all the above information provided that Jeanette LOPEZ, Samuel P. STAIR, Russell V. MCDADE, Otis LOCKETT, J.M.L., Ronald J. HEISEL, Ricky M. CRUZ, Alberto L. BOFFIL Jr., Walter J. RINGERSMA, Abraham M. LOPEZ, Brandon R. KING, Todji Y. ANDERSON Jr., Martin L. SINCLAIR, Jennifer O. PIERCE, Regina N. STAIR, Tracey L. UNDERWOOD, Shirtreal D. ROBY, "FROG" (Antone ROSS), William D. ESKRIDGE, Allyse D. JONES, Victoria T. ALLEN, Jermaine A. ERVING, and others continue to use the **Target Cell Phones** during their illegal activities, including communicating with known and unknown co-conspirators, even as MCDADE is in custody. Case agents further believe Jeanette LOPEZ, Samuel P. STAIR, Russell V. MCDADE, Otis LOCKETT, J.M.L., Ronald J. HEISEL, Ricky M. CRUZ, Alberto L. BOFFIL Jr., Walter J. RINGERSMA, Abraham M. LOPEZ, Brandon R. KING, Todji Y. ANDERSON Jr., Martin L. SINCLAIR, Jennifer O. PIERCE, Regina N. STAIR, Tracey L. UNDERWOOD, Shirtreal D. ROBY, "FROG" (Antone ROSS), William D. ESKRIDGE, Allyse D. JONES, Victoria T. ALLEN, Jermaine A. ERVING, and other known and unknow DTO members, has made and will continue to make frequent visits to locations in which the DTO stores and distributes narcotics and/or pick up drug proceeds or location directed to do so by MCDADE and others including likely meeting drug sources. Case agents believe that the continued historical and prospective monitoring of the **Target Cell Phones'** location will assist in identifying potential other sources of supply, distributors, and locations associated with the DTO.

122. I believe **Target Cell Phones**, whose service provider is T-Mobile. a wireless

telephone service provider ( "Service Provider"), contains valuable information that could be used as evidence for the distribution and possession with intent to distribute controlled substances; conspiracy to distribute and possess with the intent to distribute controlled substances; maintain drug involved premises; use of a communication facility in furtherance of a drug trafficking offense, violations of Title 21, United States Code, Sections 841, 843(b), 846, and 856.

123. Based on my training and experience, I know that Service Provider can collect historical and prospective cell-site data and historical and prospective E-911 Phase II data about the location of the **Target Cell Phones**, including by initiating a signal to determine the location of the **Target Cell Phones** on Service Provider's network or with such other reference points as may be reasonably available.

124. In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

**Cell-Site Data**

125. Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about the **Target Cell Phones**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

**E-911 Phase II / GPS Location Data**

126. I know that some providers of cellular telephone service, including Service Provider, have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.

127. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.

128. I also know that certain wireless providers, such as Service Provider, can provide precision location information, also known as estimated location records or historical handset location data, on both a historical and prospective basis. Each provider refers to its proprietary estimates of a cellular device's location differently. This information, however, is sometimes referred to as geolocation information (PING), Network Event Location System (NELOS) data, Global Positioning System (GPS) data, cell tower triangulation or trilateration, round-trip time or real-time tool (RTT), per-call measurement data (PCMD), historical E911 data, or precision measurement information.

129. Based on my training and experience, I know that Service Provider also can collect per-call measurement data, which Service Provider also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

130. Accordingly, cell-site data is typically less precise than E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the **Target Cell Phones**, including by initiating a signal to determine the location of the **Target Cell Phones** on the Service Provider's network or with such other reference points as may be reasonably available.

**Pen-Trap Data**

131. Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an

Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

**Subscriber Information**

132. Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **Target Cell Phones** user or users and may assist in the identification of co-conspirators.

133. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify **Target Cell Phones'** user or users, the locations of that user or users, and the patterns of that user or users. A frequency analysis

of the telephone communications between Jeanette LOPEZ, Samuel P. STAIR, Russell V. MCDADE, Otis LOCKETT, J.M.L., Ronald J. HEISEL, Ricky M. CRUZ, Alberto L. BOFFIL Jr., Walter J. RINGERSMA, Abraham M. LOPEZ, Brandon R. KING, Todji Y. ANDERSON Jr., Martin L. SINCLAIR, Jennifer O. PIERCE, Regina N. STAIR, Tracey L. UNDERWOOD, Shirtreal D. ROBY, "FROG" (Antone ROSS), William D. ESKRIDGE, Allyse D. JONES, Victoria T. ALLEN, Jermaine A. ERVING, and other identified and unidentified subjects is material, in that it can establish whether the calls described above are a deviation from their normal patterns of communication. The frequency analysis of the locations associated with the cellular devices can establish whether the locations are deviations or consistent with normal patterns. This information is relevant to show whether Jeanette LOPEZ, Samuel P. STAIR, Russell V. MCDADE, Otis LOCKETT, J.M.L., Ronald J. HEISEL, Ricky M. CRUZ, Alberto L. BOFFIL Jr., Walter J. RINGERSMA, Abraham M. LOPEZ, Brandon R. KING, Todji Y. ANDERSON Jr., Martin L. SINCLAIR, Jennifer O. PIERCE, Regina N. STAIR, Tracey L. UNDERWOOD, Shirtreal D. ROBY, "FROG" (Antone ROSS), William D. ESKRIDGE, Allyse D. JONES, Victoria T. ALLEN, Jermaine A. ERVING, and others acted-in-concert, by establishing the nature and extent of their relationship, the existence and scope of the conspiracy, the pattern of their communications, their patterns of travel, and any deviations from those patterns.

**AUTHORIZATION REQUEST**

134. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

135. I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

136. I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the **Target Cell Phones** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

137. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until April 29, 2026, pursuant to the Omnibus Order signed by Honorable Judge Stephen C. Dries on April 29, 2025. This investigation is expected to remain covert at least until then, so disclosing the warrant would alert targets or subjects about the existence of a federal investigation. This investigation targets a sophisticated drug trafficking organization with multiple targets, subjects, and witnesses. Case agents will continue to request the same notification deadline for all warrants in this investigation, so that the notifications can be coordinated or extended as necessary. A single notification date will reduce the administrative burden on case agents and the Court, minimize the risks of disclosure, and promote judicial economy. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C.

§ 2705. Providing immediate notice to the subscriber or user of the **Target Cell Phones** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

138. Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **Target Cell Phones** outside of daytime hours.

<u>**ATTACHMENT A**</u>
**Property to Be Searched**
**MATTER NUMBER 2024R438**

1. Records and information associated with the cellular device assigned call number **(773) 981-6881 ("Target Cell Phone 7")** and **(262) 330-2333 ("Target Cell Phone 8")**, whose service provider is T-Mobile ("Service Provider") a wireless telephone service provider headquartered at 4 Sylvan Way Parsippany NJ,07054 or any other cell phone servicing company currently servicing **Target Cell Phone 7 and/or "Target Cell Phone 8",** number during the requested period.

2. **Target Cell Phone 7**.

3. **Target Cell Phone 8.**

## ATTACHMENT B
**Particular Things to be Seized**
**MATTER NUMBER 2024R438**

## I. Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with the **Target Cell Phones** for the time period from March 13, 2026, to present:

   i. Names (including subscriber names, user names, and screen names);
   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);
   iii. Local and long-distance telephone connection records;
   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;
   v. Length of service (including start date) and types of service utilized;
   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");
   vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);
   viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and
   ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **Target Cell Phones**, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(B) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received).

b. Information associated with each communication to and from the **Target Cell Phones** for a period of 30 days from the date of this warrant, including:
   i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;
   ii. Source and destination telephone numbers;
   iii. Date, time, and duration of communication; and
   iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **Target Cell Phones** or will connect at the beginning and end of each communication.

The Court has also issued an order(s) pursuant to 18 U.S.C. § 3123, dated today's date, for such information associated with the **Target Cell Phones**.

c. Information about the location of the **Target Cell Phones** for a period of **30 days**, during all times of day and night. "Information about the location of the **Target Cell Phones** includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

   i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the **Target Cell Phones** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.
   ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence and instrumentalities of distribution and possession with intent to distribute controlled substances; conspiracy to distribute and possess with the intent to distribute controlled substances; maintain drug involved premises; use of a communication facility in furtherance of a drug trafficking offense, violations of Title 21, United States Code, Sections 841, 843(b), and 846, have been committed by Jeanette LOPEZ, Samuel P. STAIR, Russell V. MCDADE, Otis LOCKETT, J.M.L., Ronald J. HEISEL, Ricky M. CRUZ, Alberto L. BOFFIL Jr., Walter J. RINGERSMA, Abraham M. LOPEZ, Brandon R. KING, Todji Y. ANDERSON Jr., Martin L. SINCLAIR, Jennifer O. PIERCE, Regina N. STAIR, Tracey L. UNDERWOOD, Shirtreal D. ROBY, "FROG" (Antone ROSS), William D. ESKRIDGE, Allyse D. JONES, Victoria T. ALLEN, Jermaine A. ERVING, and other unidentified subject(s) since at least August 2024.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Service Provider in order to locate the things particularly described in this warrant.